**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL NAKAMURA, individually and on behalf of all others similarly situated, | Case No.:   1:26-cv-03914 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| PFIZER INC., | |
| Defendant. | |

Paul Nakamura ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendant Pfizer Inc. ("Defendant" or "Pfizer"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

**NATURE OF THE ACTION**

1.      In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2.      Pfizer is a global biopharmaceutical company engaged in the discovery, development, manufacture, marketing, distribution, and sale of medicines and vaccines for a wide range of medical conditions and diseases. Founded in 1849, Pfizer develops and markets numerous well-known pharmaceutical products and therapies across areas including oncology,

1

immunology, cardiology, internal medicine, rare diseases, and vaccines.[1] Through its commercial website, https://www.pfizer.com (the "Website"), Pfizer provides consumers, patients, healthcare professionals, and investors with information regarding its products, research initiatives, clinical trials, and corporate operations. In 2025, Pfizer reported approximately $62.5 billion in total revenue.[2]

3.      Via the Website, users access information about its pharmaceutical products, research and development initiatives, clinical trials, and corporate activities; explore resources related to patient care, healthcare providers, and investors; and review company announcements, press releases, and educational materials. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.



*Figure 1 – The Website's Privacy Banner and Cookie Settings, representing that users could change the Website's tracking behavior*

---

[1] *About*, PFIZER, https://www.pfizer.com/about (last accessed May 07, 2026)
[2] *2025 Annual Review*, PFIZER, https://annualreview.pfizer.com/#performance2025%20Annual%20Review%20%E2%80%93%20PFIZER,%20https:/annualreview.pfizer.com/#performance (last accessed May 07, 2026)

4.      Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings.

5.      Users were misled by Defendant's Privacy Banner and Cookie Settings, which led users to believe that their data would only be shared through continued use and interaction with the Website and with user consent. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website. The Website offers users the ability to limit the use and sharing of personal data through the Privacy  Banner and Cookie Settings interface. Specifically, users may: (1) click the "Decline All" (or functionally equivalent) option in the Privacy Banner to reject the sharing of their personal information; or (2) access the "Cookie Preferences" interface to manage their selections by toggling off categories such as "Marketing" and "Optional Analytics" cookies and saving their preferences to confirm their selections. Either of these actions operate to restrict the Website's use of Tracking Tools to those that are strictly required and to limit the collection, use, and sharing of users' information. However, even after

users affirmatively reject the use and sharing of their personal information and consent only to strictly required cookies, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools, including Google, LLC ("Google") (collectively referred to herein as the "Tracking Entities"). Pfizer's Privacy Banner and Cookie Settings are deceptive because (1) the Website places Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website, before users have the ability to interact with the Privacy Banner, (2) the Privacy Banner is presented as an opt-in system, while placing Tracking Tools and sharing users' Sensitive Information by default, and (3) the Website continues to use Tracking Tools that intercept and transmit users' Sensitive Information to Tracking Entities after users decline the use and sharing of their personal information and reject all non-essential Tracking Tools. Pfizer's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit users' data constitute an invasion of privacy, an intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a tracking mechanism and a user's ability to decline consent to the sharing of their Sensitive Information effectively deprives users of control over their Sensitive Information and their privacy. In short, via the Website's Privacy Banner and Cookie Settings, Defendant materially misleads users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

4

6.      Plaintiff's experience reflects the conduct described above. Plaintiff, a resident of California, visited Defendant's Website in July 2025 for ordinary consumer purposes, including browsing content and otherwise navigating the Website's content.

7.      While accessing the Website from his home state, Plaintiff encountered the Website's Privacy Banner and Cookie Settings. Plaintiff affirmatively rejected the sharing of his personal information and the Website's use of Tracking Tools other than strictly required cookies, relying on Defendant's representations that Tracking Tools would not be deployed by the Website without his consent. Despite these actions and expectations, the Website deployed Tracking Tools that automatically intercepted Plaintiff's Sensitive Information and transmitted Plaintiff's Sensitive Information to the Tracking Entities.

8.      In each instance, Plaintiff reasonably relied on Defendant's representations regarding data privacy controls and privacy protections, yet his Sensitive Information was nonetheless collected and shared against his express rejection. Plaintiff was thereby subjected to unauthorized disclosure of his communications and deprived of the benefit of the privacy choice that Defendant represented users could obtain through rejecting the use of Tracking Tools.

9.      Defendant invaded Plaintiff's fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiff's Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping) and 638.51 (unlawful use of a pen register or trap and trace device); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., and common law, including invasion of privacy, intrusion

upon seclusion, fraud and deceit, and unjust enrichment. Plaintiff brings this action on behalf of himself and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

11.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

12.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

13.     Plaintiff Paul Nakamura is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Nakamura accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Nakamura visited Defendant's Website, in or about July 2025, for consumer browsing purposes, including researching information related

to COVID-19 vaccines, such as vaccine availability, efficacy, safety, and related healthcare services or resources offered through Defendant's Website. Plaintiff consistently rejects the use of Tracking Tools on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Nakamura was presented with the Website's Privacy Banner offering the options "Decline All," "Accept All," and "Cookie Preferences." Plaintiff Nakamura affirmatively selected "Decline All" in reliance on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Nakamura reasonably believed that by declining, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Nakamura's affirmative rejection of non-essential tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Nakamura's browsing activity, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Nakamura's communications with the Website, including the pages and product information he chose to review, together with identifiers and related metadata. As a result, Plaintiff Nakamura's Sensitive Information was intercepted and recorded without his consent. Had Plaintiff Nakamura known that he could not rely on Defendant's representations regarding Tracking Tools, he would not have navigated to, browsed, or used Defendant's Website.

14.     Defendant Pfizer Inc. is a for-profit corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York, and is registered to conduct business throughout the United States, including in the State of California. Pfizer is a global pharmaceutical company that develops, manufactures, and markets biopharmaceutical products, and operates its website located at https://www.pfizer.com.

**FACTUAL ALLEGATIONS**

**I.    How Websites Function**

15.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

16.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[3]

17.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[4]

18.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[5]

19.    An IP address is "a unique address that identifies a device on the Internet or a local network."[6] In essence, an IP address is defined as follows:

---

[3] *Browsing the web: What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited May 7, 2026).

[4] *Id.*

[5]    *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 7, 2026).

[6] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 7, 2026).

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[7]

20.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[8]

21.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

22.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[9] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[10]*

23.    Website owners or web developers write and manage the URLs for their websites.

---

[7] *Id.*
[8] *Id.*
[9] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[10] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited May 7, 2026).

24.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[11] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

25.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[12] Today, UTF-8 is the Internet's most common character encoding.[13]

26.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[14] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[15]*

27.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[11] *Id.*
[12] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 7, 2026).
[13] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited May 7, 2026).
[14] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited May7, 2026).
[15]    Viraj    Shetty,    *URL    Encoding    in    a    few    minutes*,    YOUTUBE    (Sept.    5,    2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 7, 2026).



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

28.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[16] and rendered into a visual display according to the instructions of the HTML code.[17] This is the visible, and usually interactable, website that most people think of.

29.     To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[18]

30.     Such complex tasks include code used to monitor and report users' activity.

31.     In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, and when and how they do it, and with what software and hardware.

32.     Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

---

[16] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[17] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[18]     *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

**II.     Defendant Programmed the Website To Include Third-Party Resources that Utilize Cookies and Tracking Tools**

33.     Defendant voluntarily integrated Tracking Tools from at least one Tracking Entity into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including at least one Tracking Entity.  The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

34.     First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity. Third-party cookies are placed by domains other than the Website's domain, such as google.com and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

35.     As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

36.     Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

37.     Defendant owns and operates the Website, which allows users to access information regarding its pharmaceutical products, research and development initiatives, clinical trials, and corporate activities; explore resources for patients, healthcare providers, and investors; review news, press releases, and educational materials; and subscribe to updates or other informational content. When users interact with the Website by navigating pages, clicking links, or entering information, they communicate directly with Defendant. Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted to the Tracking Entity associated with each Tracking Tool, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines

which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities. Defendant's explanation as to its use of Tracking Tools on the Website is contained in the Cookie Settings:  Cookies and similar technologies typically collect information about how you use a website, such as pages and content you view, information you submit, digital tools you use, and links you click. Depending on your interactions with us, this information may suggest certain details about your health, which may be considered sensitive.[19]

38.    The Cookie Settings state that users can decline non-required cookies, including marketing and optional analytics cookies, which will result in less personalized marketing.

39.    The Cookie Settings further represent that "Required Cookies" are used for the Website to function and save user preferences:

**Required Cookies**

These cookies allow us to deliver our services and content. These cookies include cookies that are necessary for the website to function and are set in response to actions made by you, such as setting your privacy preferences, logging in or filling in forms. Some of these cookies allow us to provide enhanced functionality and make the website easier to use and others allow us to count visits and traffic sources so we can measure and improve the performance of our sites. You can set your browser to block or alert you about some of these cookies, but some parts of the site will not then work.

40.    The Cookie Settings further represent that "Marketing Cookies" are used to provide personalized marketing for users, identify users, and share information with third parties:

---

[19] *See Figures 1* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.

**Marketing Cookies**

These cookies help us share advertising content with you that you may find interesting and relevant. These cookies store certain information that uniquely identify your browser and internet device. These cookies enable us to collect information about your interaction with our website. Pfizer may use and share the collected information with our third-party marketing partners to tailor your digital experience, our services, and advertising content for you. If you do not allow these cookies, you will experience less personalized marketing content and targeted advertising.

41.    The Cookie Settings further represent that "Optional Analytics" cookies are used to measure user interactions with the website and to share information with third parties:

**Optional Analytics**

These cookies measure your interactions with our website so we may learn what content is most useful to users and enhance user experience. Pfizer may share the collected information with our third-party partners to receive analytics services. Once shared, these partners may use this information for their own purposes. These cookies may be set through our site by our advertising partners.

42.    Defendant's Privacy Banner and Cookie Settings clearly inform users that their detailed browsing activity and interactions with the Website would ***not*** be captured and transmitted to Tracking Entities via the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when users affirmatively rejected the use and sharing of their personal information and consented only to strictly required cookies.

III.    **The Website's Privacy Banner and Cookie Settings Misled Users**

43.    When users visited the Website, the Website immediately displayed the Privacy Banner that stated:

Pfizer uses cookies and similar technologies to enhance and personalize your customer experience. By clicking "Accept All", you grant Pfizer permission to collect, use, and share information about your website interactions with our third-party partners (such as our advertising and analytics partners) to tailor your digital experiences, our services, and advertising content for you. You may withdraw your permission at any time by clicking "Cookie Preferences" at the bottom of our website and clicking "Decline All". If you click "Decline All", your digital experience, our services, and advertising content may not be personalized or

18

targeted to you directly. To learn more about how Pfizer uses these technologies, please read our Privacy Policy.[20]

44.    The Privacy Banner presented users with options to "Accept All," "Decline All," or manage their "Cookie Preferences," as well as a hyperlink to Defendant's Privacy Policy. Upon selecting any "Accept All" or "Decline All," the Privacy Banner disappears from view.



*Figure 7 –Pfizer's Cookie Settings, representing that users can manage the use of cookies and the sharing of personal data*

45.    Website users who selected the "Manage Preferences" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared by accepting only necessary cookies.

46.    After users clicked the "Decline All" button, the Cookie Settings window disappeared.

47.    The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiff, and would reasonably lead all Website users similarly situated, to believe that they

---

[20] *See Figures 1* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.

19

had successfully declined the sharing of their personal information and disabled all but strictly required cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiff and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. The Privacy Banner further led Plaintiff and all reasonable users to believe that Tracking Tools would not be placed unless they first consented to the sharing of their personal information. Plaintiff acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of his personal information and use of any Tracking Tools other than required cookies.

48.     These representations were false. Defendant did not abide by Plaintiff's expressed preferences and does not abide by users' expressed preferences. When users choose to decline any sharing of their personal information and decline all cookies other than those required, they clearly communicate that they do not consent to the placement or transmission of Tracking Tools other than those required for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

49.     The wording of Defendant's Privacy Banner misleads not only users who rejected, but all users on the Website who did not affirmatively consent to the Website's use of Tracking Tools. The Privacy Banner claims that "By clicking 'Accept All', you grant Pfizer permission to collect, use, and share information about your website interactions with our third-party partners (such as our advertising and analytics partners) to tailor your digital experiences, our services, and advertising content for you. You may withdraw your permission at any time by clicking

20

'Cookie Preferences' at the bottom of our website and clicking 'Decline All'." This wording represents to users that they only will be tracked by Tracking Tools if they opt-in to and actively consent to the tracking. This is false. The Tracking Tools are placed on users' browsers by default.

50.    The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their (and Defendant's) monetary gain.

**IV.    Defendant's Website Uses Tracking Tools To Spy on Users**

51.    Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities. Generally, the Tracking Tools collect information about users' activity on the Website when events specified by Defendant, such as loading specific webpages, clicking links, or submitting information, are triggered. Defendant adds parameters to these events that determine the scope and specificity of the data collected. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[21]

52.    URL parameters include key-value pairs formatted as "key=value."

      a.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[21] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited May 7, 2026).

    b.     The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 10 - Diagram of a URL displaying how parameters function*[22]

## A. Google Ads

53.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[23]

54.    The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[24] (iii) Google then allows advertisers to bid on those various keywords;[25] (iv) the

---

[22] *Id.*

[23] *Achieve all your ad goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited May 7, 2026).

[24] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited May 7, 2026).

[25] *Id.*

advertiser with the highest bid wins the auction, and the ad is displayed on the search results page;

and (v) the winning ad appears above or below the organic search results and is marked as an ad.

55.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[26] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

56.    AdSense for content or AdSense for search are methods by which AdSense functions.[27] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

57.    Google Ads intercepted Plaintiff's Website activity, as depicted below. This interception occurred through users' browsers as communications were sent and/or received on users' devices.

---

[26] *Home*, GOOGLE ADSENSE, https://adsense.google.com/start/ (last visited Jan 6, 2026).
[27] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).



*Figure 9 – Google Ads intercepting users' communications*

24

58.     Google uses the NID cookie to identify users on the Website.[28] This allows them to match the intercepted communications with a specific user.

59.     While a normal user can only view the AdSense events through developer tools, advertisers and website owners such as the Defendant are able to view these events in an aggregated and easily readable format. Google provides AdSense users, such as the Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.[29]

60.     Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

61.     Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

62.     Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[30] Google uses data on how users interact with websites to train its algorithms to provide more accurate and relevant search results.[31] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop

---

[28] *Privacy & Terms: How Google uses cookies*, GOOGLE, https://policies.google.com/technologies/cookies?hl=en-US (last accessed May 8, 2026)

[29] *Overview of AdSense Reports*, GOOGLE, https://support.google.com/adsense/answer/9831227?hl=en (last accessed May 11, 2026)

[30] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited May 7, 2026).

[31] *Id.*

advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[32]

63.     Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

**B.  Google DoubleClick**

64.     DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to connect with website owners and buy ad space within other websites, and allows website owners to track the performance of their ads across websites.[33] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and website owners that are looking to purchase ad space on a website.[34]

65.     DoubleClick allows companies to buy online advertising and impressions through the DoubleClick Ad Exchange.[35] A DoubleClick account requires the use of a corresponding Google AdSense account.[36] DoubleClick is typically used for large-scale advertising as the

---

[32] *Id.*

[33] *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP, https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited May 7, 2026).

[34] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT, https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited May 7, 2026).

[35] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en (last visited May 11, 2026).

[36] *DFP Glossary:  How Does DoubleClick DFP Work?*, ADPUSHUP https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited May 7, 2026).

DoubleClick Ad Exchange connects and aggregates website owners and advertisers. The DoubleClick Ad Exchange contains over 89 percent of the current ad space market.[37]

66.    The DoubleClick Ad Exchange connects buyers and sellers of ad space in real time. When a page with an ad space loads, also known as an impression, buyers and sellers are connected in a real-time auction for that space. Sellers automatically bid based on the value of that space to them[38]. This value can be based on the content of the page and the characteristics of the audience.

67.    Defendant sends users' page views to Google via the URL googleads.g.doubleclick.net as depicted below:



---

[37] *Google DoubleClick*, 6SENSE, https://6sense.com/tech/ad-exchange/google-doubleclick-market-share last visited May 11, 2026)

[38] *The DoubleClick Ad Exchange*, GOOGLE, https://www.google.com/adexchange/AdExchangeOverview.pdf (last accesed May 11, 2026)







*Figure 10 –DoubleClick intercepting and obtaining user communications*

68.     The bidding system is similar to the Google Ads system. First, Google Ad Manager has various fee structures that can be utilized, including a percentage of spend plus a flat monthly fee, a flat monthly fee or percentage of spend, whichever is higher, or a flat fee percentage based on the amount you spend every month.[39] Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

69.     As explained above, DoubleClick ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive 51 percent of the revenue recognized by Google.[40]

70.     The DSID cookie is used by Google to link individual users with advertising and analytic events.[41] This allows Google to link the intercepted communications with specific users.

71.     While a normal user can only view the DoubleClick events through developer tools, advertisers and website owners such as the Defendant are able to view these events in an aggregated and easily readable format. Google provides DoubleClick users, such as the Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.[42]

## V.    Defendant's Conduct Violated the Federal Wiretap Act and CIPA

72.     Courts analyze claims under Cal. Penal Code § 631 under the same framework

---

[39] Joe Balestrino, *How Much Does Google Ads Management Cost?* (Feb. 17, 2023) JOE BALESTRINO, https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited May 8, 2026).

[40] *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited May 8, 2026).

[41] D.J. Leith, *Cookies, identifiers and other data that google silently stores on android handsets*, COMPUTERS & SECURITY, VOLUME 165, JUNE 2026, https://www.sciencedirect.com/science/article/pii/S016740482600026X (last accessed May 8, 2026)

[42] *About Interactive reports*, GOOGLE, https://support.google.com/admanager/answer/16071282?sjid=15404833465464052848-NA#about-interactive-reports&zippy=%2Cupdates-based-on-your-feedback-q%2Ccan-i-provide-feedback-about-the-new-interactive-reports-tool  (last accessed May 11, 2026)

applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

73.     Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

74.     Similarly, the federal Wiretap Act prohibits the intentional interception[43] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

### A. The Tracking Entities Intercepted the Contents of Communications between users and the Website in Transit

75.     Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

76.     Here, the network requests intercepted by the Tracking Entities included detailed Request URLs created by Defendant containing the names and file locations of webpages, the detailed URLs and content users requested and accessed on the Website, identifying information in the form of cookies, and users' activity information reflecting their interactions with the Website.

77.     The Tracking Tools intercepted the contents of Plaintiff's communications contemporaneously with Plaintiff's interactions with the Website. The Tracking Tools began

---

[43] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiff's browsers, and additionally transmit data at the moment Plaintiff submitted information through the Website.

78.    This interception, duplication, and transmission occurred inside Plaintiff's browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

79.    The Tracking Entities were third parties to Plaintiff's communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

80.    Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiff accessed on the Website, in violation of CIPA at Cal. Penal Code § 631 and the federal Wiretap Act at 18 U.S.C. § 2511(1)(a).

**B. Defendant Procured Tracking Entities and Aided Tracking Tool Interceptions**

81.    A party violates Cal. Penal Code § 631 and 18 U.S.C. § 2511(1) not only by directly intercepting communications, but also by knowingly permitting, procuring, or facilitating third-party interception. *See Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) ("[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap.").

82.    Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiff's communications with the Website.

83.    CIPA at Cal. Penal Code § 631(a) requires the prior consent of all parties to the communication.

31

84.     The Federal Wiretap Act at 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

85.     Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid prior consent from Plaintiff and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

**C.  The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

86.     California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

87.     California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

88.     The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

32

89. Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).

90. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses as well as recording the routing and addressing information. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Google IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiff's devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiff's devices.

91. Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

92. CIPA at California Pen. Code § 637.2 imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

93. Defendant did not obtain Plaintiff's or the Class members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway**

94. When users visit Defendant's Website, they are presented with a Privacy Banner and Cookie Settings that state that users can decline all sharing of their personal information and all non-required cookies, including those from the Tracking Entities.

95. The Cookie Settings provides toggles and controls that allow users to decline Tracking Tools that are not required for the Website to function.

33

96.     Users who decline data sharing reasonably believe that non-required tracking will stop. The Cookie Settings communicate that users can prevent their browsing activity from being shared with Tracking Entities through the use of cookies.

97.     These representations are false.

98.     Even after users declined the sharing of their personal information and non-required cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Website and transmitted those communications and identifiers to third-party tracking companies.

99.     Users were told they could disable tracking, attempted to disable it, and Defendant continued tracking users regardless.

**E.  Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Settings**

100.    Plaintiff's investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Accept Cookies" or "Decline All" on the Privacy Banner.

101.    As a result, users were tracked from the moment they began using the Website, without prior consent.

102.    Plaintiff visited the Website while those default tracking settings were active.

103.    Users who visit the Website are shown a Privacy Banner offering the option to opt-in to the use of Tracking Tools, affirmatively decline their use, and the ability to modify cookie preferences.



*Figure 11 – The Privacy Banner shown to users who visit the Website*

104.    Despite those representations, even users who declined all sharing of their personal information continued to be tracked by at least Google PageAd and Google Doubleclick.



*Figure 12- Google Doubleclick intercepting users' communications who declined cookies*



*Figure 13 – Google Ads intercepting users' communications who declined cookies*

105.    Defendant intentionally shared users' Sensitive Information with Google, placed

Google tracking cookies on the Website, and allowed Google to track users and intercept their

36

communications with the Website, despite stating in the Privacy Banner that they would not collect, use, or share users' personal information if they rejected the Tracking Tools and, as stated in the Cookie Settings, that Tracking Tools such as cookies would not be placed if users rejected the use of non-required cookies.

106.    Defendant placed, and allowed to be placed, the DSID and NID cookies from Google. These cookies identify users and allow the Tracking Entities to track users, intercept their communications, and build personal profiles based on that tracking.

107.    Defendant represented to all users that they would only be tracked by cookies and other similar technologies if they opted-in to and actively consent to the tracking by clicking "Accept All". This was false. The Tracking Tools were placed on users' browsers by default.

108.    This representation misled all users who chose to accept all cookies on the Website. Users saw the banner and believed that they would not be tracked unless they actively accepted tracking based on Defendant's representation. Despite this representation, Defendant placed, and allowed to be placed, the Tracking Tools without users clicking on "Accept All".

109.    Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' selections.

110.    Defendant and the Tracking Entities benefited from the interception of Plaintiff's communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiff's browsing habits and interests, and by using those profiles for targeted advertising.[44]

---

[44]         *[GA4]    User    Explorer*    GOOGLE, https://support.google.com/analytics/answer/9283607?sjid=14886665613336572022-NA#zippy=%2Cin-this-article (last visited May 7, 2026).

111.    The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[45]

## CLASS ALLEGATIONS

112.    Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclass (collectively "the Class").

113.    Plaintiff brings this class action individually and on behalf of the following Class:

All natural persons who visited Defendant's Website in the United States during the applicable limitations period, who interacted with the Website's Privacy Banner and/or Cookie Settings and did not affirmatively accept the Website's use of Tracking Tools, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Class").

114.    Plaintiff brings this class action individually and on behalf of the following California Subclass:

All members of the Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of California (the "California Subclass").

115.    Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

---

[45]    *See    Data    sharing    settings*, GOOGLE https://support.google.com/analytics/answer/1011397?hl=en&ref_topic=2919631&sjid=14886665613386572022-NA (last visited May 7, 2026).

116.    Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

117.    NUMEROSITY: At this time, Plaintiff does not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

118.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

      a.    Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

      b.    Whether Defendant obtained effective and informed consent to do so;

      c.    Whether Defendant's conduct constitutes a violation of the Wiretap Act;

      d.    Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties; and

      e.    Whether the Class members are entitled to injunctive relief.

119.    TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class members.

120.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

121.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the California Subclass)**

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

123.    Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

124.    Defendant has intruded upon the legally protected privacy interests of Plaintiff and the California Subclass members by, among other things, permitting Tracking Tools to intercept

40

and make use of users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

125. Plaintiff and the California Subclass members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[46] Plaintiff expected that his interactions with the Website would not be shared with third-party analytics providers.

126. Plaintiff and the California Subclass members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline the sharing of personal information and decline non-required cookies.

127. Despite Plaintiff's and the California Subclass members' selections, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed users' profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

128. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

---

[46] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

129. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

130. Plaintiff and the California Subclass members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

**COUNT II**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiff and the California Subclass)**

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

132. Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

133. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

134. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, voters stated that: The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our

privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom. Plaintiff and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiff and California Subclass members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information." The privacy rights of Plaintiff and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff and the California Subclass members. Plaintiff and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' selections, Defendant violated their reasonable expectation of privacy.

135.    Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

136.    As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## COUNT III
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of Plaintiff and the California Subclass)

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

138. Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

139. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

140. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a). The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the

acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021). The Website, the Tracking Tools, and Plaintiff's devices and browsers each qualify as a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).rWithin the relevant time period, the Tracking Entities, including Google, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. rWithin the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

141.    Plaintiff and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of the Plaintiff and the California Subclass members' respective rights to privacy.

## COUNT IV
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiff and the California Subclass)

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

143.    Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

144.    California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code §§ 630.50-638.55

145.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

146.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023). Cal. Penal Code § 638.51(a) provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…." Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses,

routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

147.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff and the California Subclass members' activity on the Web. Defendant did not obtain consent from Plaintiff or the California Subclass members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

## COUNT V
## VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiff and the Class)

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

149.    Plaintiff brings this cause of action on behalf of himself and all Class members.

150.    The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

151.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

152.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

47

153.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

154.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

155.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

156.    Plaintiff, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

157.    The Tracking Tools, Plaintiff's devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

158.    Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including the pages he viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all tracking and all non-required cookies.

159.    Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiff's consent from Plaintiff's browser, for the unlawful purpose of monetizing the Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

48

160.    Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, viewed content, or otherwise communicated information to the Website through his browser.

161.    At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

162.    Plaintiff did not consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiff affirmatively declined Tracking Entities' tracking through Defendant's Privacy Banner.

163.    The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

164.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a.      damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b.      statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.      reasonable attorneys' fees and costs.

<u>**COUNT VI**</u>
**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1770, et seq.**
**(On Behalf of Plaintiff and the California Subclass)**

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

166.    Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

167.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

168.    Defendant is a person within the meaning of the CLRA.

169.    Plaintiff is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Website to browse for information.

170.    Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated Cal. Civ. Code § 1770(a)(2) by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

171.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

172.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

173.    Defendant's failure to disclose was material to Website users, such as Plaintiff. Users could have chosen a different website that did not use Tracking Tools, chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled, and/or chosen a website that requested consent before implementing Tracking Tools.

174.    Plaintiff and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On Behalf of Plaintiff and the California Subclass)**

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

176.    Plaintiff brings this cause of action on behalf of himself and all California Subclass members.

177.    The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code § 17200.

178.    By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website, Defendant has violated the unlawful prong of the UCL.

179.    Defendant has violated the unlawful prong of the UCL by way of Defendant's above-described violations of the Wiretap Act, CIPA, and the FSCA arising from Defendant's purposeful installation and utilization of the Tracking Tools on the Website.

180.    By actively and fraudulently deceiving users about their ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

181.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed Plaintiff's and the California Subclass members' Sensitive Information

51

without their knowledge or consent. Defendant disclosed Plaintiff's and the California Subclass members' information to the Tracking Entities to build personal profiles without their knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about their ability to disable the Tracking Tools. Through this conduct, Defendant violated the unfair prong of the UCL.

182.    Plaintiff has standing to bring claims against Defendant under the UCL. Plaintiff's information was tracked and recorded without consent. Plaintiff's data was used to build personal profiles for advertising purposes without consent.

183.    Plaintiff would have considered it important to the decision to visit Defendant's Website to know that his data was being tracked and recorded without his consent, and regardless of privacy elections made through the Privacy Banner and Cookie Settings.

184.    Instead, Plaintiff exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential tracking had been disabled and that Plaintiff's information would not be shared with Tracking Entities.

185.    Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of his personal data and having his Sensitive Information tracked and recorded without his consent.

186.    Plaintiff and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VIII**
**COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION**
**(On Behalf of Plaintiff and the Class)**

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

188.    Plaintiff brings this cause of action on behalf of himself and all Class members.

189. Defendant made affirmative representations to users through its Privacy Banner, Cookie Settings, and related disclosures that users could reject the sharing of personal information and could decline all non-necessary cookies.

190. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

191. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

192. These representations were false and misleading. Before users, including Plaintiff and the Class members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-required cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiff's and the Class members' Sensitive Information and transmit the same to the Tracking Entities, despite Defendant's representation in the Privacy Banner that it would not track users until they consented to the Tracking Tools.

193. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted them to decreased information intake if their "opt-in" Tracking Tool scheme was functioning as described.

194. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites

to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

195. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

196. Plaintiff and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

197. Plaintiff's and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

198. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiff and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

199. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon declining.

200.    Plaintiff and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

<u>**COUNT IX**</u>
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

202.    Plaintiff brings this cause of action on behalf of himself and all Class members.

203.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

204.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

205.    Plaintiff and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and the Class members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   An order certifying the class and making all appropriate class management orders;

b.   For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the respective Class and Subclass and their counsel as Class Counsel;

c.   For an order declaring the Defendant's conduct violates the statutes referenced herein;

d.   For an order finding in favor of Plaintiff, the Class, and the California Subclass, on all counts asserted herein;

e.   Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.   An award of statutory damages or penalties to the extent available;

g.   For damages in amounts to be determined by the Court and/or jury;

h.   For pre-judgment interest on all amounts awarded;

i.   For an order of restitution and all other forms of monetary relief;

j.   An award of all reasonable attorneys' fees and costs; and

k.   Such other and further relief as the Court deems necessary and appropriate.

56

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: May 12, 2026                 **LEVI & KORSINSKY, LLP**

By: */s/ Mark S. Reich*
Mark S. Reich (MR-4166)
Mark Jensen*
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mjensen@zlk.com

*Attorneys for Plaintiff and the Proposed Class*

\**pro hac vice* forthcoming