**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**AT FOLEY SQUARE**

| | |
|---|---|
| PAUL NAKAMURA and TERRY MYERS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PFIZER INC.,<br><br>Defendant. | Case No.: 1:26-cv-03914-JMF<br><br>Honorable Judge Jesse M. Furman<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Paul Nakamura and Terry Myers ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Consolidated Class Action Complaint against Defendant Pfizer Inc. ("Defendant" or "Pfizer"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Pfizer is a global biopharmaceutical company engaged in the discovery, development, manufacture, marketing, distribution, and sale of medicines and vaccines for a wide range of medical conditions and diseases. Founded in 1849, Pfizer develops and markets

numerous well-known pharmaceutical products and therapies across areas including oncology, immunology, cardiology, internal medicine, rare diseases, and vaccines.[1] Through its commercial website, https://www.pfizer.com (the "Website"), Pfizer provides consumers, patients, healthcare professionals, and investors with information regarding its products, research initiatives, clinical trials, and corporate operations. In 2025, Pfizer reported approximately $62.5 billion in total revenue.[2]

3. Via the Website, users access information about its pharmaceutical products, research and development initiatives, clinical trials, and corporate activities; explore resources related to patient care, healthcare providers, and investors; and review company announcements, press releases, and educational materials. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

---

[1] *About*, PFIZER, https://www.pfizer.com/about (last accessed May 07, 2026)
[2] *2025 Annual Review*, PFIZER, https://annualreview.pfizer.com/#performance2025%20Annual%20Review%20%E2%80%93%20PFIZER,%20https:/annualreview.pfizer.com/#performance (last accessed May 07, 2026)




*Figure 1 – The Website's Privacy Banner and Cookie Settings, representing that users could change the Website's tracking behavior*

4. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings.

5. This includes Tracking Tools from third-party marketing companies, all of which use the data intercepted from visitor interactions with Pfizer's Website to build individualized profiles of patients' interests and personal information, including the drugs they shop for and the associated conditions from which they suffer. Third-party marketing companies whose cookies and tracking technologies remain present on Pfizer Website even after the visitor clicks "Decline All" include, but are not limited to: LiveRamp, DeepIntent, Id5, Lotame, The Trade Desk, Kargo, Adobe, DoubleClick, and Google Ads. Plaintiffs refer to these companies and all additional entities whose cookies and tracking technologies remain on the site after visitors click "Decline All" as the "Tracking Entities."

6. Users were misled by Defendant's Privacy Banner and Cookie Settings, which led users to believe that their data would only be shared through continued use and interaction with the Website and with user consent. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website. The Website offers users the ability to limit the use and sharing of personal data through the Privacy Banner and Cookie Settings interface. Specifically, users may: (1) click the "Decline All" (or functionally equivalent) option in the Privacy Banner to reject the sharing of their personal information; or (2) access the "Cookie Preferences" interface to manage their selections by toggling off categories such as "Marketing" and "Optional Analytics" cookies and saving their preferences to confirm their selections. Either of these actions operate to restrict the Website's use of Tracking Tools to those that are strictly required and to limit the collection, use, and sharing of users' information. However, even after users affirmatively reject the use and sharing of their personal information and consent only to strictly required cookies, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools. Pfizer's Privacy Banner and Cookie Settings are deceptive because

(1) the Website places Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website, before users have the ability to interact with the Privacy Banner, (2) the Privacy Banner is presented as an opt-in system, while placing Tracking Tools and sharing users' Sensitive Information by default, and (3) the Website continues to use Tracking Tools that intercept and transmit users' Sensitive Information to Tracking Entities after users decline the use and sharing of their personal information and reject all non-essential Tracking Tools. Pfizer's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit users' data constitute an invasion of privacy, an intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a tracking mechanism and a user's ability to decline consent to the sharing of their Sensitive Information effectively deprives users of control over their Sensitive Information and their privacy. In short, via the Website's Privacy Banner and Cookie Settings, Defendant materially misleads users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

7. Plaintiffs' experiences reflect the conduct described above. Plaintiffs, residents of California, visited Defendant's Website for ordinary consumer purposes, including browsing content and otherwise navigating the Website's content.

8. While accessing the Website from their home state, Plaintiffs encountered the Website's Privacy Banner and Cookie Settings. Plaintiffs affirmatively rejected the sharing of their personal information and the Website's use of Tracking Tools other than strictly required cookies, relying on Defendant's representations that Tracking Tools would not be deployed by

the Website without their consent. Despite these actions and expectations, the Website deployed Tracking Tools that automatically intercepted Plaintiffs' Sensitive Information and transmitted Plaintiffs' Sensitive Information to the Tracking Entities.

9. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding data privacy controls and privacy protections, yet their Sensitive Information was nonetheless collected and shared against their express rejection. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could obtain through rejecting the use of Tracking Tools.

10. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping), 632, 638.51 (unlawful use of a pen register or trap and trace device), California's Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; California's Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq.*; and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, negligence, negligence per se, breach of contract, unjust enrichment, and breach of fiduciary duty. Plaintiffs also seek a declaratory judgment declaring that Defendant continues to owe a legal duty to secure patients' Sensitive Information and Defendant continues to breach this legal duty by disclosing patients' Sensitive Information to the Tracking Entities.

11. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

13. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

14. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15. Plaintiff Paul Nakamura is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Nakamura accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Nakamura visited Defendant's Website, in or about July 2025, for consumer browsing purposes, including researching information related to COVID-19 vaccines, such as vaccine availability, efficacy, safety, and related healthcare

services or resources offered through Defendant's Website. Plaintiff consistently rejects the use of Tracking Tools on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Nakamura was presented with the Website's Privacy Banner offering the options "Decline All," "Accept All," and "Cookie Preferences." Plaintiff Nakamura affirmatively selected "Decline All" in reliance on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Nakamura reasonably believed that by declining, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Nakamura's affirmative rejection of non-essential tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Nakamura's browsing activity, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Nakamura's communications with the Website, including the pages and product information he chose to review, together with identifiers and related metadata. As a result, Plaintiff Nakamura's Sensitive Information was intercepted and recorded without his consent. Had Plaintiff Nakamura known that he could not rely on Defendant's representations regarding Tracking Tools, he would not have navigated to, browsed, or used Defendant's Website.

16. Plaintiff Terry Myers is a natural person and a citizen of the State of California, where he intends to remain. Plaintiff Myers resides in San Ramon, California, in Contra Costa County. Plaintiff used Defendant's Website to research medications, including Lopid, whose product-specific sub-page is available at www.pfizer.com/products/product detail/lopid. When presented with Defendant's Privacy Banner, Plaintiff Myers declined cookies. On information and belief, notwithstanding Plaintiff Myers' rejection of cookies, Defendant nevertheless caused

dozens of tracking cookies to be installed on Plaintiff Myers' device and facilitated the interception by the Tracking Entities of Plaintiffs' browsing activity, page views, and unique identifiers associated with his browser, among other information. This tracking activity disclosed data including the medications he was prescribed, vaccines he had received, and information about his diagnosed health conditions.

17. Defendant Pfizer Inc. is a for-profit corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York, and is registered to conduct business throughout the United States, including in the State of California. Pfizer is a global pharmaceutical company that develops, manufactures, and markets biopharmaceutical products, and operates its website located at https://www.pfizer.com.

## FACTUAL ALLEGATIONS

### I. How Websites Function

18. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

19. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[3]

20. Each webpage has a unique address, and two webpages cannot be stored at the same address.[4]

---

[3] *Browsing the web: What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited May 7, 2026).

[4] *Id.*

21. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[5]

22. An IP address is "a unique address that identifies a device on the Internet or a local network."[6] In essence, an IP address is defined as follows:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[7]

23. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[8]

24. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

25. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters.

---

[5] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 7, 2026).
[6] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 7, 2026).
[7] *Id.*
[8] *Id.*

Parameters direct a web server to provide additional context-sensitive services,[9] as depicted below:




*Figure 2 - Mozilla's diagram of a URL, including parameters*[10]

26. Website owners or web developers write and manage the URLs for their websites.

27. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[11] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

28. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[12] Today, UTF-8 is the Internet's most common character encoding.[13]

29. URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[14] To demonstrate:

---

[9] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section III.
[10] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited May 7, 2026).
[11] *Id.*
[12] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 7, 2026).
[13] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited May 7, 2026).
[14] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited May7, 2026).




*Figure 3 – Demonstrating URL encoding and decoding*[15]

30. Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

[15] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 7, 2026).




*Figure 4 – Sample webpage used to demonstrate a webpage URL*




*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*







*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

31. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[16] and rendered into a visual display according to the instructions of the HTML code.[17] This is the visible, and usually interactable, website that most people think of.

32. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[18]

33. Such complex tasks include code used to monitor and report users' activity.

34. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

35. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

---

[16] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[17] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[18] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

## II. Defendant Programmed the Website To Include Third-Party Resources that Utilize Cookies and Tracking Tools

36. Defendant voluntarily integrated Tracking Tools from Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

37. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity. Third-party cookies are placed by domains other than the Website's domain, such as google.com and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

38. As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to

intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

39. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

40. Defendant owns and operates the Website, which allows users to access information regarding its pharmaceutical products, research and development initiatives, clinical trials, and corporate activities; explore resources for patients, healthcare providers, and investors; review news, press releases, and educational materials; and subscribe to updates or other informational content. When users interact with the Website by navigating pages, clicking links, or entering information, they communicate directly with Defendant. Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted to the Tracking Entity associated with each Tracking Tool, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking

Entities. Defendant's explanation as to its use of Tracking Tools on the Website is contained in the Cookie Settings: Cookies and similar technologies typically collect information about how you use a website, such as pages and content you view, information you submit, digital tools you use, and links you click. Depending on your interactions with us, this information may suggest certain details about your health, which may be considered sensitive.[19]

41. The Cookie Settings state that users can decline non-required cookies, including marketing and optional analytics cookies, which will result in less personalized marketing.

42. The Cookie Settings further represent that "Required Cookies" are used for the Website to function and save user preferences:

> **Required Cookies**
>
> These cookies allow us to deliver our services and content. These cookies include cookies that are necessary for the website to function and are set in response to actions made by you, such as setting your privacy preferences, logging in or filling in forms. Some of these cookies allow us to provide enhanced functionality and make the website easier to use and others allow us to count visits and traffic sources so we can measure and improve the performance of our sites. You can set your browser to block or alert you about some of these cookies, but some parts of the site will not then work.

43. The Cookie Settings further represent that "Marketing Cookies" are used to provide personalized marketing for users, identify users, and share information with third parties:

[19] *See Figures 1* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.

> **Marketing Cookies**
>
> These cookies help us share advertising content with you that you may find interesting and relevant. These cookies store certain information that uniquely identify your browser and internet device. These cookies enable us to collect information about your interaction with our website. Pfizer may use and share the collected information with our third-party marketing partners to tailor your digital experience, our services, and advertising content for you. If you do not allow these cookies, you will experience less personalized marketing content and targeted advertising.

44. The Cookie Settings further represent that "Optional Analytics" cookies are used to measure user interactions with the Website and to share information with third parties:

> **Optional Analytics**
>
> These cookies measure your interactions with our website so we may learn what content is most useful to users and enhance user experience. Pfizer may share the collected information with our third-party partners to receive analytics services. Once shared, these partners may use this information for their own purposes. These cookies may be set through our site by our advertising partners.

45. Defendant's Privacy Banner and Cookie Settings clearly inform users that their detailed browsing activity and interactions with the Website would ***not*** be captured and transmitted to Tracking Entities via the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when users affirmatively rejected the use and sharing of their personal information and consented only to strictly required cookies.

## III. The Website's Privacy Banner and Cookie Settings Misled Users

46. When users visited the Website, the Website immediately displayed the Privacy Banner that stated:

> Pfizer uses cookies and similar technologies to enhance and personalize your customer experience. By clicking "Accept All", you grant Pfizer permission to collect, use, and share information about your website interactions with our third-party partners (such as our advertising and analytics partners) to tailor your digital experiences, our services, and advertising content for you. You may withdraw your permission at any time by clicking "Cookie Preferences" at the bottom of our website and clicking "Decline All". If you click "Decline All", your digital experience, our services, and advertising content may not be personalized or

targeted to you directly. To learn more about how Pfizer uses these technologies, please read our Privacy Policy.[20]

47. The Privacy Banner presented users with options to "Accept All," "Decline All," or manage their "Cookie Preferences," as well as a hyperlink to Defendant's Privacy Policy. Upon selecting any "Accept All" or "Decline All," the Privacy Banner disappears from view.




*Figure 7 –Pfizer's Cookie Settings, representing that users can manage the use of cookies and the sharing of personal data*

48. Website users who selected the "Manage Preferences" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared by accepting only necessary cookies.

49. After users clicked the "Decline All" button, the Cookie Settings window disappeared.

50. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they

[20] *See Figures 1* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.

had successfully declined the sharing of their personal information and disabled all but strictly required cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. The Privacy Banner further led Plaintiffs and all reasonable users to believe that Tracking Tools would not be placed unless they first consented to the sharing of their personal information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of their personal information and use of any Tracking Tools other than required cookies.

51. These representations were false. Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users choose to decline any sharing of their personal information and decline all cookies other than those required, they clearly communicate that they do not consent to the placement or transmission of Tracking Tools other than those required for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities, including LiveRamp, DeepIntent, Id5, Lotame, The Trade Desk, Kargo, Adobe, DoubleClick, and Google Ads, could intercept, transmit, and use users' Sensitive Information in real time.

52. The wording of Defendant's Privacy Banner misleads not only users who rejected, but all users on the Website who did not affirmatively consent to the Website's use of Tracking Tools. The Privacy Banner claims that "By clicking 'Accept All', you grant Pfizer permission to collect, use, and share information about your website interactions with our third-party partners (such as our advertising and analytics partners) to tailor your digital experiences, our services,

and advertising content for you. You may withdraw your permission at any time by clicking 'Cookie Preferences' at the bottom of our website and clicking 'Decline All.'" This wording represents to users that they will only be tracked by Tracking Tools if they opt-in to and actively consent to the tracking. This is false. The Tracking Tools are placed on users' browsers by default.

53. The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their (and Defendant's) monetary gain.

## IV. Defendant's Website Uses Tracking Tools To Spy on Users

54. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities. Generally, the Tracking Tools collect information about users' activity on the Website when events specified by Defendant, such as loading specific webpages, clicking links, or submitting information, are triggered. Defendant adds parameters to these events that determine the scope and specificity of the data collected. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[21]

55. URL parameters include key-value pairs formatted as "key=value."

[21] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited May 7, 2026).

a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)




*Figure 8 - Diagram of a URL displaying how parameters function*[22]

**A. Google Ads**

56. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[23]

57. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's

---

[22] *Id.*
[23] *Achieve all your ad goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited May 7, 2026).

search results;[24] (iii) Google then allows advertisers to bid on those various keywords;[25] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

58. Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[26] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

59. AdSense for content or AdSense for search are methods by which AdSense functions.[27] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

60. Google Ads intercepted Plaintiffs' Website activity, as depicted below. This interception occurred through users' browsers as communications were sent and/or received on users' devices.

---

[24] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited May 7, 2026).
[25] *Id*.
[26] *Home*, GOOGLE ADSENSE, https://adsense.google.com/start/ (last visited Jan 6, 2026).
[27] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).



Headers
Payload
Preview
Response
Initiator
Timing
Cookies
General
Request URL
https://www.google.com/pagead/1p-user-list/857727753/?random=1778079578360&cv=11&fst=1778076000000&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=45be6541h1v896226799za200zd896226799xec&gcd=13l3l3l3l1l1&dma=0&tag_exp=0~115938466~115938468~116363098~117884344~118463261~118690341&u_w=1920&u_h=1080&url=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&ref=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&rcb=6&frm=0&tiba=The%20Mindfulness%20of%20Medicine%20Development%3A%20How%20Scientists%20Are%20Driving%20the%20Next%20Wave%20of%20Medical%20Innovations%20%7C%20Pfizer&hn=www.googleadservices.com&npa=0&pscdl=noapi&auid=422722936.1778077663&data=event%3Dgtag.config&rfmt=3&fmt=3&is_vtc=1&cid=CAQSvwEABaugfa1kQSD5czOaU3xqc-xs4nlxdVM_AhtdaFiejU3xDLqy5zwZS9nxD4ErB53ft94MNK9k7rFxP6AiUo-GxyBj-XKX6pDMxBV62cQkG51oNEE-DRQN6X-owcSRyZ_g6RC42mMRI3RGWjg3q2BQmJ74Me1LvxZR8QFsF9bMynuhKpBTNe2s5YbWK1jChPRj0bt3EHRMgm_ffxKJmexohSN0xtLWMMvd-6FJ1t475Qb09TlrHAqbHWnDPh9FLQ&random=1866023052&rmt_tld=0&ipr=y
Request Method
GET
Status Code
200 OK
Remote Address
142.251.156.119:443
Referrer Policy
strict-origin-when-cross-origin
Response headers (15)
Request Headers
:authority
www.google.com
:method
GET
:path
/pagead/1p-user-list/857727753/?random=1778079578360&cv=11&fst=1778076000000&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=45be6541h1v896226799za200zd896226799xec&gcd=13l3l3l3l1l1&dma=0&tag_exp=0~115938466~115938468~116363098~117884344~118463261~118690341&u_w=1920&u_h=1080&url=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next




Headers
Payload
Preview
Response
Initiator
Timing
Cookies
Query String Parameters
View source
View URL-encoded
random 1778079578360
cv 11
fst 1778076000000
bg ffffff
guid ON
async 1
en gtag.config
gtm 45be6541h1v896226799za200zd896226799xec
gcd 13l3l3l3l1l1
dma 0
tag_exp 0~115938466~115938468~116363098~117884344~118463261~118690341
u_w 1920
u_h 1080
url https://www.pfizer.com/news/articles/the_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations
ref https://www.pfizer.com/news/articles/the_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations
rcb 6
frm 0
tiba The Mindfulness of Medicine Development: How Scientists Are Driving the Next Wave of Medical Innovations | Pfizer
hn www.googleadservices.com
npa 0
pscdl noapi
auid 422722936.1778077663




| Name | Value | Domain | P... | Exp... | Size | Htt... | Sec... | Sa... | Part... | Cro... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PAPISID | PIKYrjL5Na9WJAHc/AxJordt... | .google.com | / | 202... | 51 | | ✓ | None | | | High |
| __Secure-3PSID | g.a0009QiADN7Q2YEnywcJF... | .google.com | / | 202... | 167 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDCC | AKEyXzXe92fl_PcPKsqhGlmB... | .google.com | / | 202... | 90 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDRTS | sidts-CjYBhkeRd1zKJzgwqE... | .google.com | / | 202... | 101 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDTS | sidts-CjYBhkeRd1zKJzgwqE... | .google.com | / | 202... | 100 | ✓ | ✓ | None | | | High |
| NID | 531=Scgk1M1v0Yj6ugyR4M... | .google.com | / | 202... | 338 | ✓ | ✓ | None | | | Me... |

Response Cookies

| Name | Value | Domain | P... | Exp... | Size | Htt... | Sec... | Sa... | Part... | Cro... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PSIDCC | AKEyXzXQ4kX1PMSIU6PnSHW... | .google.com | / | Ses... | 206 | ✓ | ✓ | none | | | high |

*Figure 9 – Google Ads intercepting users' communications*

61. Google uses the NID cookie to identify users on the Website.[28] This allows them to match the intercepted communications with a specific user.

62. While a normal user can only view the AdSense events through developer tools, advertisers and website owners such as the Defendant are able to view these events in an aggregated and easily readable format. Google provides AdSense users, such as the Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.[29]

63. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

64. Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

---

[28] *Privacy & Terms: How Google uses cookies*, GOOGLE, https://policies.google.com/technologies/cookies?hl=en-US (last accessed May 8, 2026)

[29] *Overview of AdSense Reports*, GOOGLE, https://support.google.com/adsense/answer/9831227?hl=en (last accessed May 11, 2026)

65. Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[30] Google uses data on how users interact with websites to train its algorithms to provide more accurate and relevant search results.[31] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[32]

66. Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

**B. Google DoubleClick**

67. DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to connect with website owners and buy ad space within other websites, and allows website owners to track the performance of their ads across websites.[33] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and website owners that are looking to purchase ad space on a website.[34]

---

[30] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited May 7, 2026).
[31] *Id.*
[32] *Id.*
[33] *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP, https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited May 7, 2026).
[34] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT, https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited May 7, 2026).

68. DoubleClick allows companies to buy online advertising and impressions through the DoubleClick Ad Exchange.[35] A DoubleClick account requires the use of a corresponding Google AdSense account.[36] DoubleClick is typically used for large-scale advertising as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers. The DoubleClick Ad Exchange contains over 89 percent of the current ad space market.[37]

69. The DoubleClick Ad Exchange connects buyers and sellers of ad space in real time. When a page with an ad space loads, also known as an impression, buyers and sellers are connected in a real-time auction for that space. Sellers automatically bid based on the value of that space to them[38]. This value can be based on the content of the page and the characteristics of the audience.

70. Defendant sends users' page views to Google via the URL googleads.g.doubleclick.net as depicted below:

[35] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en (last visited May 11, 2026).
[36] *DFP Glossary: How Does DoubleClick DFP Work?*, ADPUSHUP https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited May 7, 2026).
[37] *Google DoubleClick*, 6SENSE, https://6sense.com/tech/ad-exchange/google-doubleclick-market-share last visited May 11, 2026)
[38] *The DoubleClick Ad Exchange*, GOOGLE, https://www.google.com/adexchange/AdExchangeOverview.pdf (last accesed May 11, 2026)


Headers
Payload
Preview
Response
Initiator
Timing
Cookies
General
Request URL
https://googleads.g.doubleclick.net/pagead/viewthroughconversion/857727753/?random=1778079578360&cv=11&fst=1778079578360&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=45be6541h1v896226799za200zd896226799xec&gcd=13l3l3l3l1l1&dma=0&tag_exp=0~115938466~115938468~116363098~117884344~118463261~118690341&u_w=1920&u_h=1080&url=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&ref=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&rcb=6&frm=0&tiba=The%20Mindfulness%20of%20Medicine%20Development%3A%20How%20Scientists%20Are%20Driving%20the%20Next%20Wave%20of%20Medical%20Innovations%20%7C%20Pfizer&hn=www.googleadservices.com&npa=0&pscdl=noapi&auid=422722936.1778077663&data=event%3Dgtag.config&rfmt=3&fmt=4
Request Method
GET
Status Code
200 OK
Remote Address
142.251.218.194:443
Referrer Policy
strict-origin-when-cross-origin
Response headers (15)
Request Headers
:authority
googleads.g.doubleclick.net
:method
GET
:path
/pagead/viewthroughconversion/857727753/?random=1778079578360&cv=11&fst=1778079578360&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=45be6541h1v896226799za200zd896226799xec&gcd=13l3l3l3l1l1&dma=0&tag_exp=0~115938466~115938468~116363098~117884344~118463261~118690341&u_w=1920&u_h=1080&url=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&ref=https%3A%2F%2Fwww.pfizer.com%2Fnews%2Farticles%2Fthe_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations&rcb=6


Headers
Payload
Preview
Response
Initiator
Timing
Cookies
Query String Parameters
View source
View URL-encoded
random 1778079919991
cv 11
fst 1778079919991
bg ffffff
guid ON
async 1
en gtag.config
gtm 45be6541v896226799za200zd896226799xec
gcd 13l3l3l3l1l1
dma 0
tag_exp 0~115938465~115938468~116363098~118463261~118812187
u_w 1920
u_h 1080
url https://www.pfizer.com/news/articles/the_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations
ref https://www.pfizer.com/news/articles/the_mindfulness_of_medicine_development_how_scientists_are_driving_the_next_wave_of_medical_innovations
rcb 14
frm 0
tiba The Mindfulness of Medicine Development: How Scientists Are Driving the Next Wave of Medical Innovations | Pfizer
hn www.googleadservices.com
npa 0
pscdl noapi
auid 422722936.1778077663




*Figure 10 –DoubleClick intercepting and obtaining user communications*

71. The bidding system is similar to the Google Ads system. First, Google Ad Manager has various fee structures that can be utilized, including a percentage of spend plus a flat monthly fee, a flat monthly fee or percentage of spend, whichever is higher, or a flat fee percentage based on the amount you spend every month.[39] Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

---

[39] Joe Balestrino, *How Much Does Google Ads Management Cost?* (Feb. 17, 2023) JOE BALESTRINO, https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited May 8, 2026).

72. As explained above, DoubleClick ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive 51 percent of the revenue recognized by Google.[40]

73. The DSID cookie is used by Google to link individual users with advertising and analytic events.[41] This allows Google to link the intercepted communications with specific users.

74. While a normal user can only view the DoubleClick events through developer tools, advertisers and website owners such as the Defendant are able to view these events in an aggregated and easily readable format. Google provides DoubleClick users, such as the Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.[42]

## V. Defendant's Conduct Violated Several Promulgated Standards of Conduct

### A. Defendant's Conduct Violated HIPAA Standards

75. Information about a person's physical health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone

---

[40] *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited May 8, 2026).

[41] D.J. Leith, *Cookies, identifiers and other data that google silently stores on android handsets*, COMPUTERS & SECURITY, VOLUME 165, JUNE 2026, https://www.sciencedirect.com/science/article/pii/S016740482600026X (last accessed May 8, 2026)

[42] *About Interactive reports*, GOOGLE, https://support.google.com/admanager/answer/16071282?sjid=15404833465464052848-NA#about-interactive-reports&zippy=%2Cupdates-based-on-your-feedback-q%2Ccan-i-provide-feedback-about-the-new-interactive-reports-tool (last accessed May 11, 2026)

other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

76. Recognizing these facts, and in order to implement the requirements of the HIPAA, the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information, as the Sensitive Information Plaintiffs communicated to the Website.

77. Under HIPAA, a healthcare provider may not disclose personally identifiable, nonpublic medical information (PHI) about a patient, a potential patient, or a household member of a patient for marketing purposes without the patient's express written authorization.[43]

78. HHS guidance instructs healthcare providers that patient status alone is protected by HIPAA.

79. With respect to methods for de-identification of PHI in accordance with the HIPAA Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[44]

80. In its guidance for marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or

---

[43] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), and 164.514(b)(2)(i).

[44] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Nov. 26, 2012)https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/Deidentification/hhs_deid_guidance.pdf.

> disclosure of his or him protected health information can be made for marketing….Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.[45]

81. In addition, in December 2022, the Office for Civil Rights (OCR) at the DHSS issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology[46] (the "December 2022 Bulletin"[47]).

82. Therein, HHS defined "tracking technologies," explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[48]

83. In the Bulletin, HHS was clear and unambiguous in stating that, "[r]egulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to Tracking Technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to Tracking Technology vendors for marketing

---

[45] *Marketing*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[46] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

[47] *See* archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html

[48] *Id.*

purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[49]

84. On March 18, 2024, HHS updated its December 2022 Bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[50] [51]

85. Citing The Markup's June 2022 article, the Bulletin expressly notes:

> Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

86. An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to Tracking Technology vendors, such as the Tracking Entities, because of the proliferation of Tracking Technologies collecting sensitive information, it is critical for regulated

[49] *Id.* (citing to 45 CFR 164.508(a)(3); *see also* 45 CFR 164.501 (definition of "Marketing")).

[50] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SVCS. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[51] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[52]

87. In other words, HHS has expressly stated that Defendant's conduct of implementing the Tracking Tools on the Website is a violation of HIPAA rules.

**B. Defendant Violated FTC and HHS Standards**

88. The Federal Trade Commission ("FTC") has also recognized that implementation of Tracking Technologies poses "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[53]

89. The OCR and the FTC warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites such as Defendant's Website, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[54] OCR and FTC agree that such Tracking Technologies, like those present on Defendant's Website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[55] OCR and FTC warn that:

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information, including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[56]

---

[52] *Id.*
[53] *Re: Use of Online Tracking Technologies*, U.S. DEP'T OF HEALTH & HUMAN SERVICES, (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-PartyTrackers-07-20-2023.pdf.
[54] *Id.*
[55] *Id.*
[56] *Id.*

90. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[57]

91. Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[58] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a Tracking Technology for any marketing purposes."[59]

92. Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, including sharing of covered information without an individual's authorization, triggers notification obligations under the Rule."[60]

93. Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

[57] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.
[58] *Id.*
[59] *Id.*
[60] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices*, U.S. FED. TRADE COMMISSION, (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[61]

94. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

95. On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024 Bulletin," expanding the circumstances in which HHS would consider information from any unauthenticated website visitor to be considered PHI, and its disclosure to be a violation of HIPAA.[62] [63]

96. The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online Tracking Technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care."[64]

---

[61] *See*, *e.g.*, *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023); *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021).

[62] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SVCS. OFFICE FOR CIVIL RIGHTS, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[63] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," but acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[64] *Id.*

97. However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's I address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[65]

**C. Defendant Violated Industry Standards**

98. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

99. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Defendant and its associated physicians.

100. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

101. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient- physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved

[65] *Id.*

> (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

102. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## VI. Defendant's Conduct Violated the Federal Wiretap Act and CIPA

103. Courts analyze claims under Cal. Penal Code § 631 under the same framework applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

104. Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

105. Similarly, the federal Wiretap Act prohibits the intentional interception[66] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

### A. The Tracking Entities Intercepted the Contents of Communications between users and the Website in Transit

106. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

---

[66] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

107. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs created by Defendant containing the names and file locations of webpages, the detailed URLs and content users requested and accessed on the Website, identifying information in the form of cookies, and users' activity information reflecting their interactions with the Website.

108. The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiffs' browsers, and additionally transmit data at the moment Plaintiffs submitted information through the Website.

109. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

110. The Tracking Entities, including LiveRamp, DeepIntent, Id5, Lotame, The Trade Desk, Kargo, Adobe, DoubleClick, and Google Ads, were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

111. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA at Cal. Penal Code § 631 and the federal Wiretap Act at 18 U.S.C. § 2511(1)(a).

**B. Defendant Procured Tracking Entities and Aided Tracking Tool Interceptions**

112. A party violates Cal. Penal Code § 631 and 18 U.S.C. § 2511(1) not only by directly intercepting communications, but also by knowingly permitting, procuring, or facilitating third-party interception. *See Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) ("[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap.").

113. Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

114. CIPA at Cal. Penal Code § 631(a) requires the prior consent of all parties to the communication.

115. The Federal Wiretap Act at 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

116. Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid prior consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

**C. The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

117. California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a

wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

118. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

119. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the Website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

120. Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).

121. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses as well as recording the routing and addressing information. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Google IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

122. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

123. CIPA at California Pen. Code § 637.2 imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

124. Defendant did not obtain Plaintiffs' or the Class members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway**

125. When users visit Defendant's Website, they are presented with a Privacy Banner and Cookie Settings that state that users can decline all sharing of their personal information and all non-required cookies, including those from the Tracking Entities.

126. The Cookie Settings provide toggles and controls that allow users to decline Tracking Tools that are not required for the Website to function.

127. Users who decline data sharing reasonably believe that non-required tracking will stop. The Cookie Settings communicate that users can prevent their browsing activity from being shared with Tracking Entities through the use of cookies.

128. These representations are false.

129. Even after users declined the sharing of their personal information and non-required cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Website and transmitted those communications and identifiers to third-party tracking companies.

130. Users were told they could disable tracking, attempted to disable it, and Defendant continued tracking users regardless.

**E. Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Settings**

131. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Accept Cookies" or "Decline All" on the Privacy Banner.

132. As a result, users were tracked from the moment they began using the Website, without prior consent.

133. Plaintiffs visited the Website while those default tracking settings were active.

134. Users who visit the Website are shown a Privacy Banner offering the option to opt-in to the use of Tracking Tools, affirmatively decline their use, and the ability to modify cookie preferences.




*Figure 11 – The Privacy Banner shown to users who visit the Website*

135. Despite those representations, even users who declined all sharing of their personal information continued to be tracked by at least Google PageAd and Google Doubleclick.




*Figure 12- Google Doubleclick intercepting users' communications who declined cookies*










*Figure 13 – Google Ads intercepting users' communications who declined cookies*

136. Defendant intentionally shared users' Sensitive Information with Google, placed Google tracking cookies on the Website, and allowed Google to track users and intercept their communications with the Website, despite stating in the Privacy Banner that they would not collect, use, or share users' personal information if they rejected the Tracking Tools and, as stated in the Cookie Settings, that Tracking Tools such as cookies would not be placed if users rejected the use of non-required cookies.

137. Defendant placed, and allowed to be placed, the DSID and NID cookies from Google. These cookies identify users and allow the Tracking Entities to track users, intercept their communications, and build personal profiles based on that tracking.

138. Defendant represented to all users that they would only be tracked by cookies and other similar technologies if they opted-in to and actively consented to the tracking by clicking "Accept All". This was false. The Tracking Tools were placed on users' browsers by default.

139. This representation misled all users who chose to accept all cookies on the Website. Users saw the banner and believed that they would not be tracked unless they actively accepted tracking based on Defendant's representation. Despite this representation, Defendant placed, and allowed to be placed, the Tracking Tools without users clicking on "Accept All".

140. Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' selections.

141. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed

profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[67]

142. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[68]

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

**Plaintiff Terry Myers**

143. Plaintiff Terry Myers is a natural person and a resident of San Ramon, California (Contra Costa County). Plaintiff used Defendant's Website to research medications he had been prescribed and/or was considering taking, including Pfizer's COVID-19 vaccine and the cholesterol medication Lopid.

144. When Plaintiff Myers visited Defendant's Website, Defendant presented him with the Privacy Banner. Consistent with his standard practice of declining cookies when offered the choice—which he follows across all of his devices and browsers—Plaintiff Myers clicked "Decline All" on Defendant's Privacy Banner.

145. Plaintiff Myers reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that those communications would not be transmitted to or intercepted by a third party.

146. Plaintiff Myers provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's Privacy

---

[67] *[GA4] User Explorer* GOOGLE, https://support.google.com/analytics/answer/9283607?sjid=14886665613386572022-NA#zippy=%2Cin-this-article (last visited May 7, 2026).

[68] *See Data sharing settings*, GOOGLE https://support.google.com/analytics/answer/1011397?hl=en&ref_topic=2919631&sjid=14886665613386572022-NA (last visited May 7, 2026).

Banner, and the law. Plaintiff Myers reasonably expected that his communications with Defendant were confidential, solely between Plaintiff Myers and Defendant, and that any information he submitted to or generated through the Pfizer Website would not be transmitted to or intercepted by the Tracking Entities.

147. Plaintiff Myers never intended to sell or share his Sensitive Information with the Tracking Entities, nor would he have permitted it to be made available for sale on the resale market.

148. On information and belief, through the Website's use of the Tracking Tools, Defendant disclosed to the Tracking Entities at least the following information, which Plaintiff Myers provided to Defendant in the course of using Defendant's Website:

a. The pages and content Plaintiff Myers viewed, including pages devoted to medications Plaintiff Myers was interested in to treat his health;

b. Plaintiff Myers' status as a person with high cholesterol;

c. Plaintiff Myers' status as a person who was prescribed Xanax and Neurontin;

d. Plaintiff Myers' interest in Lopid, a cholesterol medication;

e. Plaintiff Myers' receipt of and interest in the side effects of Defendant's COVID-19 vaccine sold by Defendant.

149. Plaintiff Myers accessed Defendant's Website at Defendant's direction and encouragement. Defendant markets the Pfizer Websites as convenient, confidential, direct-to patient websites that allow patients to research Pfizer drugs and the medical conditions they treat. Plaintiff Myers relied on those representations in using the Website.

150. Plaintiff Myers would not have shared his information with Defendant, or would have taken steps to prevent such sharing, if he had known that his private health information

would be shared with the Tracking Entities in violation of Defendant's representations and legal obligations.

151. As a result of Defendant's allowing and enabling the Tracking Entities to intercept Plaintiff Myers' Sensitive Information without authorization, Plaintiff Myers was harmed in at least the following ways:

a. Loss of privacy;

b. Unauthorized disclosure of his status as a person with high cholesterol, interest in and need for cholesterol medication, and other Sensitive Information;

c. Unauthorized disclosure of his receipt of an interest in the side effects of Pfizer's COVID-19 vaccine;

d. Defendant benefited from its sharing of Plaintiff Myers' Sensitive Information without sharing that benefit with Plaintiff Myers;

e. Lost benefit of his bargain with Defendant, as Plaintiff Myers did not receive the reasonable privacy and data security protection he was promised;

f. Defendant and the Tracking Entities enriched themselves at Plaintiff Myers' expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff Myers' Sensitive Information without authorization;

g. Defendant profited from collecting and disclosing Plaintiff Myers' Sensitive Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff Myers, which may include: (1) increased payments from the placement of ads on Defendant's Website, (2) direct payments from the Tracking Entities, (3) free or reduced cost services, including services related to the implementation and monitoring of Defendant's Website, (4) the ability to purchase ad space on other

websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of Defendant's own advertisements on other websites;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff Myers' Sensitive Information; and

j. Increased risk of harm resulting from the use and disclosure of his health information and other Sensitive Information.

**Plaintiff Paul Nakamura**

152. Plaintiff Paul Nakamura is a natural person and a resident of California. Plaintiff Nakamura used Defendant's Website to research information related to COVID-19 vaccines, such as vaccine availability, efficacy, safety, and related healthcare services or resources offered through Defendant's Website.

153. When Plaintiff Nakamura visited Defendant's Website, Defendant presented him with the Privacy Banner. Consistent with his standard practice of declining cookies when offered the choice—which he follows across all of his devices and browsers—Plaintiff Nakamura clicked "Decline All" on Defendant's Privacy Banner.

154. Plaintiff Nakamura reasonably expected that his online communications with Defendant' Website were confidential, solely between himself and the Website, and that those communications would not be transmitted to or intercepted by a third party.

155. Plaintiff Nakamura provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's Privacy Banner, and the law. Plaintiff Nakamura reasonably expected that his communications with Defendant's Website were confidential, solely between Plaintiff Nakamura

and Defendant's Website, and that any information he submitted to or generated through the Website would not be transmitted to or intercepted by the Tracking Entities.

156. Plaintiff Nakamura never intended to sell or share his Sensitive Information with the Tracking Entities, nor would he have permitted it to be made available for sale on the resale market.

157. On information and belief, through the Website's use of the Tracking Tools, Defendant disclosed to the Tracking Entities at least the following information, which Plaintiff Nakamura provided in the course of using Defendant's Website:

a. The pages and content Plaintiff Nakamura viewed, including pages devoted to vaccinations Plaintiff Nakamura was interested in to treat his health;
b. Plaintiff Nakamura's vaccination status;
c. Plaintiff Nakamura's interest in the COVID-19 vaccine;
d. Plaintiff Nakamura's receipt of and interest in the side effects of Defendant's COVID-19 vaccine sold by Defendant.

158. Plaintiff Nakamura accessed Defendant's Website at Defendant's direction and encouragement. Defendant markets the Website as convenient, confidential, direct-to patient websites that allow patients to research Pfizer drugs and the medical conditions they treat. Plaintiff Nakamura relied on those representations in using the Website.

159. Plaintiff Nakamura would not have shared his information with Defendant, or would have taken steps to prevent such sharing, if he had known that his private health information would be shared with the Tracking Entities in violation of Defendant's representations and legal obligations.

160. As a result of Defendant's allowing and enabling the Tracking Entities to intercept Plaintiff Nakamura's Sensitive Information without authorization, Plaintiff Nakamura was harmed in at least the following ways:

a. Loss of privacy;

b. Unauthorized disclosure of his status as a person with interest in and need for COVID-19 vaccines and other Sensitive Information;

c. Unauthorized disclosure of his receipt of an interest in the side effects of Pfizer's COVID-19 vaccine;

d. Defendant benefited from its sharing of Plaintiff Nakamura's Sensitive Information without sharing that benefit with Plaintiff Nakamura;

e. Lost benefit of his bargain with Defendant, as Plaintiff Nakamura did not receive the reasonable privacy and data security protection he was promised;

f. Defendant and the Tracking Entities enriched themselves at Plaintiff Nakamura's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff Nakamura's Sensitive Information without authorization;

g. Defendant profited from collecting and disclosing Plaintiff Nakamura's Sensitive Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff Nakamura, which may include: (1) increased payments from the placement of ads on Defendant's Website, (2) direct payments from the Tracking Entities, (3) free or reduced cost services, including services related to the implementation and monitoring of Defendant's Website, (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of Defendant's own advertisements on other websites;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff Nakamura's Sensitive Information; and

j. Increased risk of harm resulting from the use and disclosure of his health information and other Sensitive Information.

## TOLLING, CONCEALMENT, AND ESTOPPEL

161. The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

162. Defendant actively concealed the Website's use of the Tracking Tools by providing an illusory opt-out function that did not, in fact, accomplish an opt-out. Defendant surreptitiously incorporated the Tracking Tools into its Website while explicitly denying it was doing so to Plaintiffs and members of the putative Class.

163. Plaintiffs and putative Class members could not have discovered Defendant's conduct, because Defendant actively concealed its conduct and misled Plaintiffs and putative Class members via its deceptive Privacy Banner.

164. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiffs' and the Class's Sensitive Information has continued unabated. Further, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

165. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclasses (collectively "the Class").

166. Plaintiffs bring this class action individually and on behalf of the following Class:

> All natural persons who visited Defendant's Website in the United States during the applicable limitations period, who interacted with the Website's Privacy Banner and/or Cookie Settings and did not affirmatively accept the Website's use of Tracking Tools, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Class").

167. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of California (the "California Subclass").

168. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

169. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

170. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so

numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

171. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties; and

e. Whether the Class members are entitled to injunctive relief.

172. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class members.

173. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

174. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the California Subclass)

175. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

176. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

177. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the California Subclass members by, among other things, permitting Tracking Tools to intercept and make use of users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

178. Plaintiffs and the California Subclass members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[69] Plaintiffs

[69] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that

expected that their interactions with the Website would not be shared with third-party analytics providers.

179. Plaintiffs and the California Subclass members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline the sharing of personal information and decline non-required cookies.

180. Despite Plaintiffs' and the California Subclass members' selections, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed users' profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

181. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

182. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

---

collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

183. Plaintiffs and the California Subclass members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

**COUNT II**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

184. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

185. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

186. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

187. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, voters stated that: The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data,

enabling the interception of such communications. Plaintiffs' and California Subclass members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information." The privacy rights of Plaintiffs and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass members. Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' selections, Defendant violated their reasonable expectation of privacy.

188. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

189. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

**COUNT III**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

190. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

191. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

192. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

193. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a). The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the

acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021). The Website, the Tracking Tools, and Plaintiffs' devices and browsers each qualify as a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a). Within the relevant time period, the Tracking Entities, including Google, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

194. Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of the Plaintiffs and the California Subclass members' respective rights to privacy.

**COUNT IV**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiffs and the California Subclass)**

195. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

196. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

197. CIPA § 632(a) prohibits "intentionally and without the consent of all parties to a confidential communication, us[ing a] recording device to eavesdrop upon or record the confidential communication."

198. By installing and deploying the Tracking Tools despite the Class members' lack of consent, Defendant used a recording device to record confidential communications, including the Sensitive Information described above.

199. Defendant also aided and assisted the Tracking Entities to eavesdrop in violation of § 632 by facilitating, permitting, and endorsing their use of the Tracking Tools to surreptitiously record and read communications between Class members and Defendant.

200. The recording devices used by Defendant include, but are not limited to, the devices described in Count III above.

201. Plaintiffs and the Class members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiffs and Class members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT V**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiffs and the California Subclass)**

202. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

203. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

204. California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code §§ 638.50-638.55

205. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

206. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023). Cal. Penal Code § 638.51(a) provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…." Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses,

routing information, addresses, and other signaling information of Website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

207. Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs and the California Subclass members' activity on the Web. Defendant did not obtain consent from Plaintiffs or the California Subclass members before using pen register or trap and trace technology to identify users of its Website and has violated Section 638.51. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

**COUNT VI**
**VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

208. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

209. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

210. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

211. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

212. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

213. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

214. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

215. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

216. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

217. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's Website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

218. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all tracking and all non-required cookies.

219. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for

combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

220. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, viewed content, or otherwise communicated information to the Website through their browser.

221. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

222. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined Tracking Entities' tracking through Defendant's Privacy Banner.

223. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

224. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1770, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

225. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

226. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

227. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

228. Defendant is a person within the meaning of the CLRA.

229. Plaintiffs are consumers of Defendant's services under the CLRA, as Plaintiffs used Defendant's Website to browse for information.

230. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated Cal. Civ. Code § 1770(a)(2) by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

231. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

232. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

233. Defendant's failure to disclose was material to Website users, such as Plaintiffs. Users could have chosen a different website that did not use Tracking Tools, chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled, and/or chosen a website that requested consent before implementing Tracking Tools.

234. Plaintiffs and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VIII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

235. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

236. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

237. The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code § 17200.

238. By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website, Defendant has violated the unlawful prong of the UCL.

239. Defendant has violated the unlawful prong of the UCL by way of Defendant's above-described violations of, *inter alia*, the Wiretap Act and CIPA arising from Defendant's purposeful installation and utilization of the Tracking Tools on the Website.

240. By actively and fraudulently deceiving users about their ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

241. Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed Plaintiffs' and the California Subclass members' Sensitive Information

without their knowledge or consent. Defendant disclosed Plaintiffs' and the California Subclass members' information to the Tracking Entities to build personal profiles without their knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about their ability to disable the Tracking Tools. Through this conduct, Defendant violated the unfair prong of the UCL.

242. Plaintiffs have standing to bring claims against Defendant under the UCL. Plaintiffs' information was tracked and recorded without consent. Plaintiffs' data was used to build personal profiles for advertising purposes without consent.

243. Plaintiffs would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without their consent, and regardless of privacy elections made through the Privacy Banner and Cookie Settings.

244. Instead, Plaintiffs exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential tracking had been disabled and that Plaintiffs' information would not be shared with Tracking Entities.

245. Because of Defendant's UCL violations described above, Plaintiffs suffered injury by losing control of their personal data and having their Sensitive Information tracked and recorded without their consent.

246. Plaintiffs and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## <u>COUNT IX</u>
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Class)

247. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

248. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

249. Defendant made affirmative representations to users through its Privacy Banner, Cookie Settings, and related disclosures that users could reject the sharing of personal information and could decline all non-necessary cookies.

250. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

251. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

252. These representations were false and misleading. Before users, including Plaintiffs and the Class members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-required cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities, despite Defendant's representation in the Privacy Banner that it would not track users until they consented to the Tracking Tools.

253. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted them to decreased information intake if their "opt-in" Tracking Tool scheme was functioning as described.

254. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites

to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

255. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

256. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

257. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

258. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

259. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon declining.

260. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT X**
**COMMON LAW NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

261. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

262. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

263. Plaintiffs and Class Members submitted sensitive nonpublic personal and health information, including sensitive health information and other Sensitive Information, when accessing Defendant's Website.

264. Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' sensitive health information and other Sensitive Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of the information.

265. Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' sensitive personal and health information and other Sensitive Information by disclosing and providing access to this information to Tracking Entities for the financial benefit of the Tracking Entities (and undisclosed fourth parties) and Defendant.

266. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their sensitive

health information and other Sensitive Information to benefit the Tracking Entities (and fourth parties) and Defendant. Defendant actively solicited patients to use its Website and obtained their Sensitive Information in connection therewith.

267. Plaintiffs' and Class Members' sensitive health information and other Sensitive Information are highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their sensitive health information and other Sensitive Information to Tracking Entities. This disclosure was of benefit to the Tracking Entities (and fourth parties) and Defendant.

268. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of sensitive health information and other Sensitive Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

269. As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their sensitive health information and other Sensitive Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, and emotional distress, resulting from the unauthorized disclosure of their Sensitive Information.

270. Defendant's negligence and breach of its common-law duties to exercise reasonable care directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in fact and damages, including, without limitation: the unauthorized access of their sensitive health information and other Sensitive Information by the Tracking Entities (and fourth parties); improper disclosure of their Sensitive Information; embarrassment, humiliation,

frustration, and emotional distress; loss of value of their Sensitive Information; and other economic harm.

271. Defendant's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' sensitive health information and other Sensitive Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, restitution, and all other relief allowed by law.

272. Plaintiffs and Class Members seek to recover the value of the unauthorized access to their sensitive health information and other Sensitive Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information has quantifiable monetary value. Plaintiffs and Class Members are entitled to such remedies.

273. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT XI
## COMMON LAW NEGLIGENCE PER SE
## (On Behalf of Plaintiffs and the Class)

274. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

275. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

276. Plaintiffs bring this negligence per se count in the alternative to their common law negligence claim.

277. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), and California state statutes and regulations, Defendant had a duty to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiffs' and Class Members' Sensitive Information from unauthorized disclosure.

278. Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

279. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Sensitive Information.

280. Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their Sensitive Information being improperly disclosed to unauthorized the Tracking Entities.

281. It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Sensitive Information in compliance with applicable laws would result in the Tracking Entities gaining unauthorized access to Plaintiffs' and Class Members' Sensitive Information, and resulting in Defendant's liability under principles of negligence per se.

282. Defendant violated its duty under Federal and State laws by failing to use reasonable measures to protect Plaintiffs' and Class Members' Sensitive Information and not complying with applicable industry standards as described in detail herein.

283. Plaintiffs' and Class Members' Sensitive Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

284. As a proximate result of Defendant's negligence per se and breach of duties as set forth above, Plaintiffs and Class Members were caused to, inter alia, suffer the harms and injuries described herein.

285. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' Sensitive Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, restitution, and all other relief allowed by law.

286. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT XII**
**VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**
**Cal. Penal Code § 502**
**(On Behalf of Plaintiffs and the California Subclass)**

287. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

288. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

289. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals,

businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," and finding and declaring "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a). 142. In enacting the CDAFA, the Legislature further found and declared "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those systems." Cal. Penal Code § 502(a).

290. Plaintiffs' and the Class Members' devices on which they accessed Defendant's Website, including their computers, smartphones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5). 144. By conduct complained of in the preceding paragraphs, Defendant violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices to wrongfully obtain and use their personal data, including their Sensitive Information, in violation of Plaintiffs' and Class Members' reasonable expectations of privacy in their devices and the information stored thereon. 145. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiffs' and the Class Members' Sensitive Information.

291. Defendant used Plaintiffs' and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendant intentionally concealed from Plaintiffs and Class Members that Defendant had secretly installed tracking pixels on its Website that surreptitiously shared Sensitive Information with Tracking

Entities. Had Plaintiffs and Class Members known this, they would not have used Defendant's Website.

292. The computers and mobile devices that Plaintiffs and Class Members used when accessing Defendant's Website all have and operate "computer services" within the meaning of CDAFA. Defendant violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, inter alia, in connection with the collection of Sensitive Information.

293. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

294. Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via the Tracking Tools embedded into the Website which intercepted Plaintiffs' and the Class Members' private and sensitive medical information.

295. Defendant's violation of the CDAFA caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of their relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value

d. Plaintiffs and Class Members did not get the full value of the services for which they bargained, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Sensitive Information.

296. Plaintiffs and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civ. Code § 3294.

297. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIII**
**VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT,**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

298. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

299. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

300. The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civ. Code § 1798.100.

301. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

302. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. The CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." Cal. Civ. Code § 1798.175.

303. Defendant collected Plaintiffs' and Class Members' Sensitive Information, including their personal information, with the purpose of providing pharmaceutical products and services in the course of and as part of its business in California.

304. Plaintiffs allege that even after expressly promising not to deploy the Tracking Tools without users' consent, Defendant allowed the Tracking Entities to embed the Tracking Tools on the Website, which intercepted, collected, and transmitted Plaintiffs' Sensitive Information without their consent.

305. Disclosing Plaintiffs' and Class Members' Sensitive Information to Third Parties was not reasonably necessary or proportionate to perform the pharmaceutical services they sought or received.

306. By collecting, using, and selling Plaintiffs' and Class Members' personal information and Sensitive Information to Tracking Entities for third-party (and fourth-party) use, all without providing consumers with notice, Defendant violated the CCPA.

307. By failing to inform consumers like Plaintiffs and Class Members of the personal information collected about them and the Third Parties with whom that personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendant violated the CCPA.

308. By failing to abide by consumers' express requests not to share personal and other information with Third Parties, Defendant violated the CCPA.

309. Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs will send Defendant notice of their CCPA claims shortly after the date of this filing. If Defendant does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendant has failed to cure the CCPA violations described herein.

310. As a result of Defendant's reckless violations, Plaintiffs are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

## COUNT XIV
## COMMON LAW BREACH OF CONTRACT
## (On Behalf of Plaintiffs and the Class)

311. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

312. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

313. Defendant's representations to Plaintiffs and Class members regarding its use of the Tracking Tools, including the representations in its Privacy Banner, constitute a contract. By clicking "Reject," Plaintiffs and the Class members indicated their acceptance of Defendant's express offer not to employ cookie and tracking technologies while they navigated Defendant's Website. In exchange for Plaintiffs' and Class members' use of Defendant's Website, Defendant agreed to not share Plaintiffs' and Class members' Sensitive Information with Third Parties.

314. Plaintiffs and Class members would not have provided their personal information to Defendant, including Sensitive Information, or would have paid less for Defendant's services, in the absence of the contract binding them and Defendant. Defendant's promised safeguarding of the Sensitive Information was critical to realize the intent of the parties.

315. As detailed above, Defendant breached its contracts with Plaintiffs and Class Members by disclosing their information to Third Parties in direct contravention of the Privacy Banner.

316. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

**COUNT XV**
**COMMON LAW UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

317. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

318. Plaintiffs bring this cause of action on behalf of themselves and all Class members and in the alternative to the breach of contract claim.

319. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

320. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

321. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members. Equity

and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

**COUNT XVI**
**COMMON LAW BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

322. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

323. Plaintiffs bring this cause of action on behalf of themselves and all Class members

324. A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect their Sensitive Information, and Defendant accepted that trust.

325. Defendant breached the fiduciary duty that it owed to Plaintiffs and the Class Members by failing to act with good faith, fairness, and honesty, and failing to protect their Sensitive Information.

326. Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiffs and the Class, as alleged herein.

327. But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiffs and the Class would not have occurred.

328. Defendant's breach of fiduciary duty substantially contributed to Plaintiffs' and Class Members' damages.

329. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, compensatory, nominal and punitive damages, injunctive relief, and all other relief allowed by law.

**COUNT XVII**
**DECLARATORY JUDGEMENT**
**(On Behalf of Plaintiffs and the Class)**

330. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

331. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

332. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state laws described herein.

333. An actual controversy has arisen regarding Defendant's present and prospective common law and other duties to keep its patients' Sensitive Information confidential and whether Defendant is currently keeping that information confidential. Plaintiffs are Defendant's consumers who used Defendant's Website to research medications and obtain other health-related information. Plaintiffs and Class Members continue to face ongoing harm as the Tracking Tools remain operative on Defendant's Website.

334. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant continues to owe a legal duty to secure patients' Sensitive Information;

b. Defendant continues to breach this legal duty by disclosing patients' Sensitive Information to Third Parties. Sensitive Information

335. The Court should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including Sensitive Information, confidential consistent with law and industry standards.

336. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as the Tracking Tools remain operative on Defendant's Website to this day. If additional disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not susceptible to easy quantification.

337. The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if Defendant continues to disclose its patients' Sensitive Information, Plaintiffs and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping Sensitive Information confidential is relatively low compared to the harm suffered by Plaintiffs and Class Members.

338. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing Defendant's additional unlawful disclosures of patients' Sensitive Information, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of Website visitors whose information has been unlawfully disclosed.

## PRAYER

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representative of the respective Class and Subclasses and their counsel as Class Counsel;

c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Class, and the California Subclass, on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f. An award of statutory damages or penalties to the extent available;

g. For damages in amounts to be determined by the Court and/or jury;

h. For pre-judgment interest on all amounts awarded;

i. For an order of restitution and all other forms of monetary relief;

j. An award of all reasonable attorneys' fees and costs; and

k. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED this 24th day of August, 2026.

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile:(872) 263-1109
raina@straussborrelli.com

By: */s/ Mark S. Reich*
Mark S. Reich
Mark Jensen (*pro hac vice* forthcoming)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
mreich@zlk.com
mjensen@zlk.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on August 24, 2026, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 24th day of August, 2026.

Respectfully submitted,

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile:(872) 263-1109
raina@straussborrelli.com